No. 92,704

HAYES SIGHT & SOUND, INC., d/b/a WOODY'S FURNITURE, *Appellee/Cross-appellant,* v. ONEOK, INC. and MID CONTINENT MARKET CENTER, INC., *Appellants/Cross-appellees.* DECOR PARTY SUPPLIES OF KANSAS, INC. and ARNOLD FROESE AND CAROL FROESE, *Appellees/Cross-appellants,* v. ONEOK, INC. and MID CONTINENT MARKET CENTER, INC., *Appellants/Cross-appellees.*

(136 P.3d 428)

Opinion filed June 16, 2006.

*Lynn W. Hursh*, of Armstrong Teasdale LLP, of Kansas City, Missouri, argued the cause, and *Gerald A. King*, *Darren K. Sharp*, and *Karrie J. Clinkinbeard*, of the same firm, and *Ross Hollander*, of Joseph & Hollander, P.A., of Wichita, were

with him on the briefs for appellants/cross-appellees ONEOK, Inc., and Mid Continent Market Center, Inc.

*Jay F. Fowler*, of Foulston Siefkin LLP, of Wichita, argued the cause, and *James D. Oliver, Timothy B. Mustaine, Mark A. Biberstein*, and *Todd N. Tedesco*, of the same firm, were with him on the briefs for appellees/cross-appellants Hayes Sight & Sound, Inc., d/b/a Woody's Furniture, Decor Party Supplies of Kansas, Inc., and Arnold Froese and Carol Froese.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The Hutchinson businesses Hayes Sight & Sound, Inc., d/b/a Woody's Furniture (Woody's) and Decor Party Supplies of Kansas, Inc. (Decor) were destroyed on January 17, 2001, when natural gas migrated from underground storage caverns and ignited. In the negligence action brought by Woody's and Decor against ONEOK, Inc. (ONEOK) and its wholly owned subsidiary, Mid Continent Market Center, Inc. (MCMC), a jury found each defendant 50% at fault. The compensatory damages awarded to Woody's were $955,636.76, and to Decor were $755,251.40. The jury also found that punitive damages should be awarded against MCMC. The trial judge awarded punitive damages in the amount of $5,250,000 for the two consolidated cases.

ONEOK and MCMC do not appeal the jury's finding of liability or its finding that MCMC's wanton conduct warranted an award of punitive damages. They do appeal the trial court's denial of their requests for setoff of subrogation claims and the amount of the punitive damages award.

Woody's and Decor cross-appeal the trial court's denial of their request for attorney fees and expenses.

The case was transferred to this court on the parties' motions. K.S.A. 20-3017.

## ISSUES

The following issues are raised by ONEOK and MCMC in their appeal:

1. DID THE TRIAL COURT ERR IN DENYING ONEOK AND MCMC'S MOTIONS FOR SETOFF OF SUBROGATION CLAIMS?

2. IS THE PUNITIVE DAMAGES AWARD GROSSLY EXCESSIVE SO AS TO VIOLATE DUE PROCESS?

3. DOES THE PUNITIVE DAMAGES AWARD VIOLATE THE STATUTORY CAP OF K.S.A. 60-3702(e)?

## FACTS:

On the morning of Wednesday, January 17, 2001, an explosion tore a 12-foot hole through the masonry fire wall between the buildings that housed Woody's and Decor. The concussion of the explosion blew out the plate glass windows of approximately 25 downtown Hutchinson businesses.

Firefighters at the fire station 2½ blocks away heard the explosion. Within a minute of the alarm at 10:47, the first firefighter, Mike Patterson, was on the scene. When he arrived, the entire Decor building was engulfed in fire. By afternoon, 80 to 90% of the Decor building was completely consumed.

The fire immediately spread to Woody's through the hole in the common wall and from burning material that blew from Decor onto Woody's roof. Unable to enter the Decor building, firefighters conducted a defensive operation using large streams of water from elevated positions. Offensive efforts were focused on Woody's, including a search-and-rescue squad and water lines in from both front and back of the building. But when rumbling indicated that the upper floors of Woody's were beginning to shift, Patterson had to order all firefighters out.

Unlike in an ordinary building fire, the flames were white-hot. Even though 4,000 gallons of water were being pumped on the fire every minute, the Woody's and Decor fire was unabated. All indications were that the fire was fuel-fed. Electricity and gas supplies to the buildings had been cut off. Efforts, including digging out the alley looking for an abandoned gas line, were made to find the fuel source. Firefighters continued to pour water on the fire, directing the streams to protect excavators and loading equipment from the heat. By approximately 1:30 or 2 a.m. the next morning, enough rubble had been removed from around the fuel source to allow a view of it.

Joe Palacioz, the Hutchinson city manager, had contacted CUDD, the oil field fire company that worked in Kuwait during the Persian Gulf war, to help determine the source of the problem, the degree of danger, what to expect, and what steps should be taken. CUDD representatives arrived in Hutchinson about 2:30 a.m. on January 18.

Joe Ratigan, an engineer with 30 years experience consulting on storing commodities in underground salt caverns, was hired and brought to Hutchinson by one of the companies with storage facilities in the area. Once the company was satisfied that its facility was not involved, Ratigan went to work for the City.

At approximately 4:45 on Wednesday afternoon, a geyser had been reported at another location in Hutchinson. There was something under tremendous pressure pushing liquid 25 to 30 feet up out of the ground. It was flammable. From that and its other characteristics, it was determined that natural gas was involved. Other geysers developed, and, from Wednesday through Sunday, they erupted from the ground. Ratigan had never seen geysers of brine and gas like there were in Hutchinson.

The geysers were indicative of gas at a depth at significant pressure. They developed where minerals had been extracted at a much earlier time from wells that had surface casings but not deep steel casings. The gas traveled along a geologic formation until it came to such a hole with no steel restraints, and there it was able to shoot to the surface. The Woody's and Decor explosion, as well as the geysers, occurred when gas rose to the surface through old wells that lacked deep casings.

Thursday morning, January 18, two people were killed in an explosion in the Big Chief Mobile Home Park, which is approximately 2½ miles from the downtown explosion. The mobile home park was evacuated, and, when it was learned that there were a number of brine wells in the vicinity, the evacuation area was expanded to include other residences and businesses. An evacuation center was set up at the state fairgrounds. State resources became available when Reno County was declared in a state of emergency. Kansas Highway Patrol, the Reno County Sheriff's staff, National Guard, and prison guards helped Hutchinson police patrol the

area. Nearby railroad traffic was stopped to prevent sparks from igniting any of the geysers.

Yaggy is a natural gas storage field located outside Hutchinson. It is operated by MCMC, a subsidiary of ONEOK, which stores natural gas in caverns in underground salt formations. MCMC contracts with Kansas Gas Service for service, legal, and corporate functions. No one is employed by MCMC, and the people performing Yaggy Field functions are employed by ONEOK. Kansas Gas Service is an incorporated division of ONEOK. The names Yaggy, ONEOK, Kansas Gas, Kansas Gas Service, and MCMC all seem to have been used in the evidence to refer to one or both of the defendants.

At the time of the Hutchinson explosions, the Yaggy storage field consisted of 70 caverns, also referred to as wells. The wells were organized in clusters, called pods. Before MCMC developed the natural gas storage field in the early 1990's, the caverns had been used for propane storage and then were plugged and abandoned in 1989.

On Thursday afternoon, Mike Patterson and CUDD representatives went to the Yaggy facility to find out if it was losing pressure through loss of product. Rather than having Patterson and the CUDD representatives come into the office at Yaggy, management there met the visitors outside. Patterson was told that MCMC had experienced a 15% pressure loss and that MCMC had become concerned when the loss had been at 1%.

Larry Fischer, vice president of operations and engineering for ONEOK and MCMC, was in charge of the company's response to the Woody's and Decor explosion and fire. He was the person from ONEOK who dealt with government officials and representatives. He was informed Wednesday evening of a leak at Yaggy. Fischer testified: "I ordered that we start withdrawing from Yaggy and tried to find a plug to set a plug in the well where we had determined there could be a breach in the casing."

On Thursday afternoon, Fischer told Palacioz he had no knowledge of any leaks at any facility. Fischer denied knowing what the problem was but said MCMC would look into it.

On Friday morning, 2 days after the Woody's and Decor explosion, Palacioz met with representatives of all the utility companies. All power and gas lines to the Woody's and Decor site were shut off, but the fire was still being fueled. The circumstances pointed to a leak at one of the facilities in the vicinity, but it was not known which one.

For Palacioz and the city, the effort to find the source of the gas and shape a remedy included meetings two to three times a day with experts and utility representatives. Ratigan advised the city to drill holes that would allow gas to vent to the atmosphere—vent wells. According to Palacioz, a lot of time was wasted by Fischer's "stonewalling." The city, through Ratigan and other consultants, supplied geologic data to ONEOK, but, according to Ratigan, ONEOK was reluctant to the point of an occasional refusal to share its information. Fischer was not forthcoming with information, and he was reluctant to drill vent wells. In these circumstances, Palacioz repeatedly confronted Fischer and threatened to put pressure on ONEOK by going to the news media. It took three threats to get information the city sought—where the gas was and how much there was in order to determine where vent wells should be located.

The City's having the information was extremely important to the public safety. When ONEOK was withholding information, Ratigan told ONEOK's consulting geologist that "if I were him I would walk out the door, based on professional ethics."

The distance between the Yaggy field and downtown Hutchinson is approximately 8 miles. Ratigan's first impression was that Yaggy was too far away from the Woody's and Decor explosion to be the origin of the gas, but, after learning about the operation there, he firmly concluded it was the source.

A maximum allowable operating pressure (MAOP) for natural gas storage wells is calculated by multiplying the pressure gradient by the feet of depth at the lowest intact portion of the casing, the casing "shoe." The MAOP was established by the Kansas Department of Health and Environment (KDHE) as the maximum pressure at which the storage wells may be operated. The initial operating authorization issued by KDHE in October 1994 for Yaggy

allowed .75 psi (pounds per square inch)/foot of depth. For Pod 1 at the Yaggy storage field, the depth used in the calculation was 745 feet. Thus, the calculated storage pressure was .75 x 745 = 558.75 psi. Well S-1, from which approximately 143 million cubic feet of gas escaped in January 2001 and surfaced in Hutchinson, was in Pod 1.

Increased pressure allows an increased volume of gas to be stored within the same space. An internal economic analysis showed that an increased volume of gas would significantly increase MCMC's profitability. Eventually the MAOP was increased by KDHE for Pod 1 at the Yaggy storage field to 682 pounds per square inch at the casing shoe. A Yaggy pressure of 682 at the casing shoe corresponded with a surface pressure reading of 670. Because pressure was monitored at the surface, the operative MAOP was 670. KDHE considered the maximum pressure to mean absolute maximum with no exceptions for exceeding the maximum pressure during injection of gas or any other process. Because the MAOP is set to maintain a safety factor, a monitoring system's alarms should not be set above the MAOP.

Gas Service internal correspondence from June 1997 revised maximum pod storage pressures so that they exceeded the MAOP. For Pod 1 the maximum operating pressure was increased from 670 to 675. In August 1999, another internal memorandum increased it to 680. In addition, the memorandum set higher limits for alarms and shutdown. For Pod 1, the high alarm was reset to 690, the high-high alarm was reset at 695, and the shutdown was set at 700. KDHE was unaware of the changes.

Richard Armer, who was a consultant on the reopening and development of Yaggy as a natural gas storage facility and was involved in initially setting the pressure gradient at .75, repeatedly had cautioned Steve Luthye, MCMC's Manager of Gas Control, that the MAOP was "just like a glass table" that could not be broken. Armer also told Luthye that pressure could not be raised without KDHE authorization. Armer testified that Gas Control people never listened to him—their job was to move large quantities of natural gas. When the operating pressure for Pod 1 was raised to exceed the MAOP set by KDHE, Armer was not informed about

it. When Armer later was shown the memo in which operating pressure was raised to 675, he disapproved of the increase because the field "had never been tested for anywhere close to that."

In January 2001, when natural gas prices were extremely high, the Yaggy gas controllers were directed to keep Pod 1 topped off. At 5:10 the morning of Sunday, January 14, 2001, while gas was being injected, the high alarm for Pod 1 was hit. At 6:02 that morning, the high-high alarm for Pod 1 was hit, and the gas controller stopped injecting gas into Pod 1. A pressure reading of 691.1 had been recorded at 6 a.m. By the next hour, the pressure had fallen to 685.2.

Luthye testified that during injection, because the gas is being pumped to the wellhead, the pressure reading in the compressor station will be higher than at the wellhead. When injection is stopped the pressure reading in the compressor station will drop to approximate the pressure at the wells. For this reason, according to Luthye, the compressor station pressure reading may exceed the MAOP during injection. Once injection is stopped, the compressor station pressure reading typically will drop 3 to 5 pounds before stabilizing. If the pressure "settled out" below the MAOP, MCMC commonly injected more gas to bring up the pressure in a pod. Ratigan testified that the gas storage industry's standard operating procedure is to keep operating pressure below the MAOP at all times, including during injection.

The Pod 1 pressure did not stop dropping off, as would have been expected. In the first hour after injection was halted, the pressure fell almost 6 pounds to 685.2. Twelve hours later it had fallen to 676.5; 24 hours after injection was stopped the pressure had fallen to 673 or 674. The drop in pressure was not investigated, but injection of gas into Pod 1 was resumed with the intention of bringing pressure back up to 690. Gas was injected into Pod 1 on Monday and Tuesday, January 15 and 16, and until 11 a.m. on Wednesday, January 17. The Woody's and Decor explosion occurred before 10:47 on Wednesday morning.

Several gas controllers on duty from Sunday through Wednesday noticed that the pressure was not rising as would have been expected and discussed it among themselves, but the gas controllers

made no calls to check on or report the circumstance until 1:10 Wednesday afternoon. The call made at 1:10 on Wednesday by one of the gas controllers was to the Yaggy Field to report that pressure in Pod 1 continued to decrease. The controller was then told not to inject any more gas into Pod 1. The explanation he was given was that it looked like one well had a restriction and was not taking as much gas as the other wells during injection but lowered the pressure after injection stopped by taking gas then.

When the pressure of stored gas is greater than the geology of the structure can contain, the cavern fractures and gas escapes, decreasing the pressure. The rupture in well S-1 that allowed large volumes of gas to escape occurred early Sunday morning. Large quantities of gas continued to be injected into Pod 1 on Sunday, Monday, Tuesday, and Wednesday morning. Injecting more gas after a fracture occurs widens it. As additional gas was pumped into Pod 1 after early Sunday morning, more and more gas was pumped along the top of a shale formation toward Hutchinson, where the gas was able to push to the surface.

ONEOK admits that gas escaping from Yaggy Storage Field created the geysers and explosions in Hutchinson in January 2001. According to ONEOK, approximately 143 million cubic feet of natural gas was lost as a result of the leak in well S-1. Well S-1 was one of a number of connected caverns making up Pod 1, so that gas from all the Pod 1 wells escaped through S-1.

Edward Ziegler, a petroleum and safety consultant, looked at the training provided by defendants to the gas controllers and found it quite deficient. In particular, he noted that the controllers' lack of training left them unable to recognize the problem that arose on January 14, and he faulted the company for not training the gas controllers in procedures to follow when they began to recognize that there was a problem. Vic Blair, who was the chief gas controller for MCMC and ONEOK Field Services, was not trained in how to assess the integrity of a pod, how to monitor pressure decreases, or what to do if pod pressure decreased more rapidly than usual. Nor were the gas controllers trained to assess integrity by comparing the volume of gas injected against capacity.

In addition to not being trained to identify or resolve a problem, the gas controllers were not properly schooled to observe the MAOP. Ronald Bonilla began working as a gas controller for MCMC in September 2000. The training he received was on-the-job training. With regard to the MAOP, he was told it was a goal to reach rather than a pressure not to be exceeded. The MCMC Pod 1 cavern pressure reports show that the 670 MAOP set by KDHE was exceeded on 45 days during the 3 months preceding January 13, 2001 (October 13, 2000, to January 13, 2001—5 days in October, 30 days in November, 10 days in December). The MAOP also was exceeded on January 14, 15, 16, and 17, 2001. Ratigan viewed MCMC's exceeding the MAOP as unprecedented and noted that violations in Texas of just a few pounds per square inch had resulted in heavy fines. Ziegler testified that he had "never, except in this case, ever heard anyone in the industry suggest that it's appropriate to inject gas above the MAOP. M stands for maximum."

KDHE required an annual report from defendants that included maximum pressure applied in each pod. The 1999 report for Yaggy Storage Field shows a maximum storage pressure for Pod 1 as 678. The pressure reading for November 10, 1999, actually was 686. For 1998 the maximum storage pressure reported for Pod 1 was 672. The pressure reading for December 7, 1998, was 688.8.

## DISCUSSION

We first consider the appellants' claim for a setoff.

In the district court, defendants filed a motion for partial summary judgment. Defendants sought to preclude plaintiffs from recovering damages for losses that had been paid by plaintiffs' insurers "to the extent ONEOK has already settled with the insurance companies and received a release." With their motion, defendants filed a statement of proposed uncontroverted statements of fact that included the following paragraphs:

"58. On October 21, 2002, a Settlement Agreement and Release was entered into between State Farm Fire & Casualty Company, on behalf of the Decor Party Supplies, Arnold Froese and Carol Froese, and ONEOK, Inc. and Mid Continent Market Center. See Settlement Agreement and Release between

State Farm Casualty Company, Inc. and ONEOK, Inc. and Mid Continent Market Center dated October 21, 2002 ('Settlement Agreement'), a true and correct copy of which is attached hereto as Exhibit F."

"107. On January 31, 2003, a Settlement Agreement and Release was entered into between Hartford Insurance, on behalf of the Woody's Plaintiffs, and ONEOK. *See* Settlement Agreement and Release between Hartford Insurance and ONEOK, Inc. and Mid Continent Market Center dated January 31, 2003 ('Settlement Agreement'), a true and correct copy of which is attached hereto as Exhibit L."

Exhibit F is an unsigned form of Settlement Agreement and Release between State Farm and defendants. Exhibit L is a Settlement Agreement and Release between The Hartford and defendants. It is signed on behalf of The Hartford. In their response to paragraph 58 of the proposed uncontroverted facts of defendants' motion for partial summary judgment, plaintiffs stated they

"do not controvert the *factual* statements about the Settlement Agreement between defendants and State Farm, which agreement in any case speaks for itself. Plaintiffs do *not* admit, but need not and will not here address, the many *legal conclusions* set forth or implicit in defendants' characterization of the agreement as to the agreement's meaning or legal effect."

Substituting The Hartford for State Farm, plaintiffs' response was the same to paragraph 107. The district judge determined that defendants' paragraphs 58 and 107 were uncontroverted.

Plaintiffs contend that defendants' proof of their settlements with the insurers is deficient. Plaintiffs direct the court's attention to the redacted and unsigned State Farm settlement form, but in responding to the motion for partial summary judgment they did not controvert defendants' factual statement about the settlement and the agreement. Plaintiffs also assert that the subrogation amounts are not in "evidence," but the record on appeal includes the insured loss amounts.

Announcing his conclusions of law from the bench, the district judge ruled on the motion for partial summary judgment that "the collateral source rule applies. And the Court agrees with the plaintiffs' proposition that the plaintiffs should be allowed in this case to pursue the full extent of their damages, irrespective of any amount that has been paid . . . by the insurance companies and by ONEOK for the insurance companies." Although denying the

motion for partial summary judgment, the district judge told defendants that they could reassert the issue of double recovery in a postjudgment motion should the plaintiffs recover damages.

The district court denied defendants' postjudgment motion for setoff without stating why. On appeal, defendants contend that the district court's decision should be overruled in order to prevent Woody's and Decor from recovering twice, once from their insurers and once from defendants, for the same losses.

MCMC and ONEOK contend that the standard of review is de novo. Their contention is based on their view that this issue is to be determined by subrogation rights drawn from the insurance policies. The construction of an insurance policy is a question of law over which the appellate court has unlimited review. *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 691, 840 P.2d 456 (1992). Woody's and Decor contend that the standard of review is abuse of discretion. Their view is that the court is reviewing the district court's denial of defendants' postverdict motion for setoff. Examination of Kansas case law reveals that a setoff is within the discretion of the trial court and that abuse of discretion is the standard of review of a district court's determination on setoff. *Mynatt v. Collis*, 274 Kan. 850, 863, 57 P.3d 513 (2002); *Taylor v. Taylor*, 180 Kan. 213, 218, 303 P.2d 133 (1956). We further agree with the plaintiffs that in the present case the setoff should be decided on equitable considerations.

Here, simply stated, is defendants' position: The jury determined that Woody's sustained damages in the amount of $955,636.76 and that Decor sustained damages in the amount of $755,251.40. Woody's insured losses amounted to $873,288.66 and Decor's insured losses amounted to $576,405.50. Also according to defendants, Woody's insurer, The Hartford, paid Woody's the amount of its insured losses and Decor's insurer, State Farm, paid Decor the amount of its insured losses. When the plaintiff insureds accepted the payments, their claims were subrogated to the insurers to the extent of the payments for the insured losses. Then, according to defendants, they settled with the insurers for undisclosed amounts and entered into a Settlement Agreement and Release with each insurance company. As a result of defendants set-

tling with the insurers, the contention continues, the insurers' rights of subrogation were extinguished and the plaintiffs could not recover the insured loss from the defendants. With the insurers' subrogation rights extinguished, damages awarded to Woody's and Decor for insured losses will not be passed on to the insurers. In those circumstances, according to defendants, they will pay twice—once to insurers in settlement and once to Woody's and Decor in satisfaction of the judgment—and Woody's and Decor will collect twice—once from their insurers and once from defendants. The way to prevent this inequity, according to defendants, is to offset the compensatory damages award by the amounts paid to plaintiffs by their insurers for insured losses or for the amount of the subrogation claim. The setoff would be the same in either case. For Woody's, the offset would be $873,288.66 from $955,636.76 for net damages of $82,348.10. For Decor, the offset would be $576,405.50 from $755,251.40 for net damages of $178,845.90.

Defendants' position is grounded on their argument that the insurers' settlement of their subrogated claims bars recovery by the insureds of the amounts paid by the insurers. Defendants rely on *Thompson v. James*, 3 Kan. App. 2d 499, 597 P.2d 259 (1979), in which Thompson's house was damaged when struck by a car driven by James. Thompson was compensated for insured losses by her insurer, and she filed suit against James seeking damages not covered by her policy. James argued that Thompson was not the real party in interest because she had been compensated for her losses, and the district court granted summary judgment in James' favor. According to the Court of Appeals, "[t]he sole substantive issue before this court on appeal is whether plaintiff was in fact a real party in interest." 3 Kan. App. 2d at 500. The Court of Appeals concluded that Thompson was the real party in interest because she had not been compensated for her uninsured losses. "When the owner's loss has been only partially satisfied by insurance, the insured is a proper party to bring suit for the deficiency." 3 Kan. App. 2d 499, Syl. ¶ 4. In reaching its conclusion, the Court of Appeals discussed several matters not essential to the decision, including defendant's settlement with plaintiff's insurer:

"While the fact that the insurer and the defendant have already reached a settlement is a complicating factor, it too does not change the result. If there were no settlement, the plaintiff would be entitled to bring suit for the entire loss and hold in trust for the insurer that part of the recovery representing the claims which the insurer has paid. *Since a settlement has already been made, the plaintiff is only entitled to bring an action for the claims not covered by the insurance policy, as the subrogation agreement bars any recovery on the claims which the insurer has already paid.*" (Emphasis added.) 3 Kan. App. 2d at 504.

*Thompson* differs from the present case in that defendant's insurer settled before suit was filed. Thus, Thompson sued James only for losses not covered by the insurance policy. However, as to plaintiffs' right to recover, it does not matter that the settlement occurred after rather than before suit was filed.

In *Dondlinger & Sons' Constr. Co. v. EMCCO, Inc.*, 227 Kan. 301, Syl. ¶ 7, 606 P.2d 1026 (1980), we recognized the well-settled rule that where the total loss has been paid by the insurer, the insurer is the real party in interest and must bring the action against the wrongdoer; conversely, where the insured has only been partially reimbursed for the loss, it is the proper party to bring suit against the wrongdoer for the entire loss. However, recovery of the insured part of the loss is held in trust for the insurer. In *Thompson*, the Court of Appeals restated the above converse rule and noted that where there is a settlement between the insurer and the defendant, the insured is no longer entitled to recover for the insured part of the loss. 3 Kan. App. 2d at 504.

Here, applying the lessons from *Thompson* and *Dondlinger*, plaintiffs were the proper party to bring this action to recover the entire loss. In case of recovery, the plaintiffs would be entitled to retain for themselves the damages awarded for the noninsured loss and would hold in trust for their insurers that part of the judgment representing the insurers' subrogation claim. However, the settlement between the insurers and the defendants extinguished the insurers' subrogation rights and thereafter the plaintiffs no longer retained the right to recover damages for the benefit of the insurer.

At this juncture we would have to conclude that the defendants are entitled to a setoff in an amount equal to that which the defendants paid to the plaintiffs' insurers in settlement of their sub-

rogation claims. The plaintiffs, however, argue that the collateral source rule applies and bar any consideration of the insurance payments in determining their damages, which, according to the plaintiffs, means they are entitled to retain the entire recovery plus that which the insurers paid for their insurance claim. The problem with plaintiffs' argument is two-fold: First, as previously stated, plaintiffs were not entitled to recovery for the insured loss after their insurers' subrogation claim was settled. Second, plaintiffs ignore the argument that the defendants are entitled to a setoff based on the settlement of the insurers' subrogation claim.

In their discussion of the collateral source rule, a number of plaintiffs' citations are to *Rose v. Via Christi Health System, Inc.*, 276 Kan. 539, 78 P.3d 798 (2003), which was modified on rehearing (after plaintiffs' brief was filed) by *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 113 P.3d 241 (2005). In the modified opinion, the court affirmed the trial court's allowing Via Christi Health System, Inc. (Via Christi), a postverdict setoff against its share of the damages awarded by the jury for medical expenses. 279 Kan. at 533.

Lyle Rose fell from bed while being treated at Via Christi. He remained in the hospital being treated for injuries resulting from the fall until he died approximately a month later. Via Christi billed him and Medicare for the full cost of treatment for the injuries. Medicare did not pay approximately $154,000 of the amount billed. In a wrongful death action, the jury found Via Christi 36% at fault, awarded total damages of $582,186.01, and awarded $261,422.46 in medical expenses. Via Christi's portion of the total judgment was $209,586.96, and Via Christi's share of the medical expenses portion of the judgment was $94,112.09. The trial court allowed Via Christi to offset the $209,586.96 by $94,112.09.

This court affirmed. Affirmance was not based on the collateral source rule, which applies when the injured party receives payment from a source independent of the tortfeasor, *i.e.*, a collateral source. 279 Kan. at 529. Rather, affirmance was "limited to the relatively rare factual situation of a tortfeasor providing the posttort medical treatment which underlies the economic loss." 279 Kan.

at 534. Hence, the modified *Rose* opinion is not helpful to the plaintiffs' position.

As noted in *Rose*, 279 Kan. at 527-29, the Restatement (Second) of Torts § 920A (1977) adopted principles consistent with Kansas common-law principles governing the effect of payments made to an injured party. Section 920A(1) applies if a tort defendant makes a payment toward its liability to the injured party: "A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability." Section 920A(1) is not applicable in the present case where the tortfeasor's payment was made to plaintiffs' insurance companies rather than to the injured parties. Section 920A(2), statement of the collateral source rule, applies if a source independent of the tort defendant makes a payment that benefits the injured party: "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." The following statement of the collateral source rule in Kansas reflects both its evidentiary and substantive aspects:

" 'At common law, the collateral source rule prevented the jury from hearing evidence of payments made to an injured person by a source *independent of the tortfeasor* as a result of the occurrence upon which the personal injury action is based. The court has stated the rule as follows: "Under the 'collateral source rule,' benefits received by the plaintiff from a source *wholly independent of and collateral to the wrongdoer* will not diminish the damages otherwise recoverable from the wrongdoer." *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 1, 740 P.2d 1058 (1987).' (Emphasis added.) *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1014, 850 P.2d 773 (1993)." 279 Kan. at 529.

Determining if the defendants are entitled to a setoff requires that we consider both the insurers' right to subrogation as well as the collateral source rule. As noted in *Thompson*, it is the settlement between the defendant and plaintiff's insurer that complicates this issue but does not change the result. Absent a settlement, the plaintiff would sue the tortfeasor for the entire loss, retain that part of the recovery representing their uninsured loss, and pay the

remainder to their insurance carrier for its subrogation claim. The collateral source rule has no application in that situation. Originally, the collateral source rule was a rule of evidence which barred evidence of the payments made to the plaintiff from a collateral source. Since the jury is not made aware of the insurance payments to the plaintiff, it is precluded from reducing or diminishing the damages based on those payments. In that way, the tortfeasor is held fully liable for his or her wrongdoing and does not benefit from such payment to the plaintiff. The same basic principle applies when several tortfeasors are responsible for damages suffered by the plaintiff. That is demonstrated in *Votolato v. Merandi,* 747 A.2d 455 (R.I. 2000). Votolato's minor daughter was killed in a motor vehicle collision. Votolato settled for $95,000 with the insurance carrier for the driver of the car in which her daughter was a passenger, and sued Merandi. The trial court allowed evidence of the $95,000 settlement, and the jury returned a verdict for the defendant. The trial court granted plaintiff's motion for a new trial based upon the admission of evidence of the settlement. The defendant appealed and the Rhode Island Superior Court affirmed and remanded for a new trial. The court held that the evidence of the settlement was not admissible under Rule 408 or under the collateral source rule. As to Rule 408, the court said:

"Traditionally, in this jurisdiction, in cases where a plaintiff already has recovered against a third party and proceeds against a remaining defendant, a motion *in limine* is ordinarily filed by the plaintiff, seeking to bar admission of any evidence of the third-party settlement agreement. The trial justice then is able to later reduce any jury award rendered in favor of the plaintiff by the corresponding amount of the third-party settlement. . . . Therefore, we conclude that unless evidence of a settlement is relevant to some issue, other than the quantum of damages, a trial justice is instructed to bar the admission of such evidence and subsequently to make the appropriate reduction in any jury award rendered in favor of the plaintiff." 747 A.2d at 461-62.

As to the collateral source rule:

"We find further support for this conclusion by analogizing to our own well-established collateral source doctrine. '[This] doctrine mandates that evidence of payments made to an injured party from sources independent of a tort-feasor are inadmissible and shall not diminish the tort-feasor's liability to the plaintiff.' *Gelsomino v. Mendonca,* 723 A.2d 300, 301 (R.I. 1999) (citing *Moniz v. Providence*

*Chain Co.*, 618 A.2d 1270, 1272 (R.I. 1993)). 'The rationale of this rule is that the injured person is entitled to be made whole, since it is no concern of the tort-feasor that someone else completely unconnected with the tort-feasor has aided his victim[.]' [Citation omitted.]" 747 A.2d at 463.

The *Estate of Farrell ex rel. Bennett v. Gordon*, 770 A.2d 517 (Del. 2001), involved application of the collateral source rule and subrogation. The plaintiff Gordon was involved in a motor vehicle collision with Farrell. Gordon's car was totaled, and the Gordons' insurance carrier paid the Gordons $19,000. The Gordons' carrier then pursued subrogation against Farrell's insurance carrier and was paid $13,000 for its subrogation claim. Notwithstanding that the Gordons had been paid in full for their damages, they sued Farrell's estate for the $6,000 difference between their actual loss and the amount Farrell's insurance carrier paid to the Gordons' carrier. The Delaware Supreme Court held that the collateral source rule allowed the Gordons to collect the $6,000 not previously paid by or in behalf of the tortfeasor (Farrell), stating:

"While the result here is somewhat anomalous to the extent that the Gordons will recover more than the value of their motor vehicle, the collateral source rule supports such recovery. The collateral source rule is firmly embedded in Delaware jurisprudence and permits an injured party to look to any contractual source for recompense notwithstanding the availability of recovery against a tortfeasor who 'has no interest in, and no right to benefit from, monies received by the injured person from sources unconnected with the [tortfeasor].' [Citations omitted.]

". . . Double recovery by a plaintiff is acceptable so long as the source of such payment is unconnected to the tortfeasor." 770 A.2d at 520.

In Note 1, the court said:

"While the Gordons' recovery may be deemed a windfall under the unusual facts of this case, they conceded that had Farrell's liability carrier reimbursed their own collision carrier in the full amount of their loss through subrogation, the collateral source rule would treat such payment as on behalf of the tortfeasors and bar further recovery." 770 A.2d at 520 n.1.

Both of these cases are instructive in resolving the setoff issue here. The collateral source rule was not at issue during the trial since neither the payments of the insurance proceeds to the plaintiffs nor the defendants' payment to settle the subrogation claim was admitted at trial. However, plaintiffs argue the collateral source

rule bars a setoff for the insurance proceeds paid to the plaintiff. Assuming that it does, the question remains whether a setoff in the amount of the subrogation claim is likewise barred. We conclude it is not. The settlement payment was made to the insurers and not to the plaintiffs; it was not made by a source independent of the tortfeasor (defendants); and it did not diminish the plaintiffs' damages.

The purpose of the tort law is to make an injured party whole. Here, the judgment against the defendants fully compensates the plaintiffs for their loss. Absent a setoff, the plaintiffs will be made more than whole, and the defendants will pay more than the amount of plaintiffs' damages. The collateral source rule does not bar a setoff based upon the defendants' settlement of the plaintiff insurers' subrogation claim. Nor does it allow the plaintiffs to recover where the defendants have paid the full amount of plaintiffs' damages. We disagree with the defendants that the setoff should be in the amount of the insurer's subrogation claim. To do so would allow the defendants to escape paying the full amount of plaintiffs' damages. The defendants are entitled to a setoff in the amount they paid to the plaintiffs' insurers to settle the subrogation claim. If that payment was less than the amount of the insurers' subrogation claim, the plaintiffs can retain the difference, and to that extent double recovery is permissible. The district court erred in denying the setoff in favor of the defendants. Upon remand, the district court shall determine the amount that defendants paid to settle the insurers' subrogation claim and grant the defendants a setoff in that amount.

Defendants next contend that the punitive damages award violates due process.

Standard of review. MCMC requests that the court substantially reduce the punitive damages award on the ground that it is an irrational and arbitrary deprivation of its property in violation of the Due Process Clause of the Fourteenth Amendment. Although MCMC recognizes that in a nonconstitutional challenge to an award of punitive damages this court has applied an abuse of discretion standard of review, *Reeves v. Carlson*, 266 Kan. 310, 316, 969 P.2d 252 (1998), it contends that whether an award is uncon-

stitutionally excessive is a question of law with an unlimited review. For the standard of review, MCMC cites *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 149 L. Ed. 2d 674, 121 S. Ct. 1678 (2001). The issue in *Leatherman Tool* was whether the federal Court of Appeals applied the wrong standard of review in considering whether the district court abused its discretion in declining to reduce the punitive damages award on constitutional grounds. The United States Supreme Court concluded "that the constitutional issue merits *de novo* review" and remanded the case to the Court of Appeals for redetermination under the proper standard. 532 U.S. at 431.

The applicable test was articulated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996), where the Supreme Court set out guideposts for determining whether a defendant received adequate notice of the magnitude of the sanction that might be imposed for its misconduct. They are (1) the degree of reprehensibility of defendant's conduct, (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 575. The guideposts were reaffirmed in *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419-29, 155 L. Ed. 2d 585, 123 S. Ct. 1513 (2003).

Woody's and Decor agree that the legal question is reviewed de novo. But they note that the district court's findings of fact are subject to deferential review. In *Leatherman Tool*, the Supreme Court stated: "While we have determined that the Court of Appeals must review the District Court's application of the *Gore* test *de novo*, it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous. [Citation omitted.]" 532 U.S. at 440 n.14.

Trial court's decision. The jury found that punitive damages should be allowed against MCMC but not against ONEOK. The trial court issued its decision on the punitive damages award from the bench at the conclusion of the hearing. The trial court stated:

"After considering the evidence presented at trial as well as that presented here for the purposes of this hearing and arguments of counsel, I cannot escape from the fact that the jury was convinced by the evidence egregious acts were committed, acts which should result in a significant punishment, and that, despite any administrative paper allocations and transfers, MCMC was the perpetrator of those acts.

"Now, after reviewing all of the evidence, it appears to me that there was a significant likelihood of serious harm arising from the knowing mismanagement of the Yaggy storage. Potential for danger is recognized generally throughout the community and nation, which gives rise to the detailed regulatory environment of this and other like adventures. The defendant had access to considerable expertise, assuring an awareness of the danger arising from poor operational practices. I am convinced that the defendant's profit motive drove the actors to ignore the imminent dangers arising from the abandonment of sound operating procedures.

"I cannot find that preincident there was any effort to hide their acts. In fact, they seemed to operate without any recognition for the general safety or concern for the community. I do believe that those involved acted purposefully to leave the public regulators in the dark. No one can doubt the level of activity within MCMC post event, but little to none of it can be considered cooperative with the public they endangered.

"The parameters of this award fall between zero and the statutory cap of ten million dollars, since this case does constitute two separate suits. While the appropriateness and necessity of a punitive award is without doubt, in my mind such an award must be tempered with reason. The purpose of the award is to punish misconduct and to assure proper deterrence against future similar acts. Towards this, neither extreme is necessary to accomplish the purpose of a punitive award. After consideration, I am going to make a punitive award, a punitive judgement in the amount of $5,250,000."

The trial court awarded Woody's and Decor $5,250,000 in punitive damages against MCMC. The total compensatory damages awarded to Woody's and Decor was $1,710,888.16, with half that amount, $855,444.08 assessed against MCMC according to the jury's 50% fault determination.

Due process. Since 1996, in *Gore* and *Campbell*, the Supreme Court has addressed excessive punitive damages as a matter of substantive due process. The principle on which these decisions rest is that the Due Process Clause of the Fourteenth Amendment to the United States Constitution prescribes substantive limits on the discretion of states to impose grossly excessive or arbitrary punishments on tortfeasors. 538 U.S. at 416-17; 532 U.S. at 433-34;

517 U.S. at 562. The stated reason is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." 517 U.S. at 574.

At issue in *Gore* was a $2 million punitive damages award to a car owner who purchased a new BMW from an Alabama dealer for approximately $40,000 without knowing that minor damage to it, presumably due to acid rain, had been partially repainted. The jury awarded $4,000 in compensatory damages on testimony that, as a result of damage and repair, a new BMW lost approximately 10% of its value. The BMW national distributor's wrongdoing was not advising its dealers, and hence their customers, of predelivery damage when repair cost less than 3% of a car's suggested retail price. Evidence presented by Gore to support his punitive damages claim was that, without disclosing it, the BMW distributor since 1983 had sold 983 refinished cars as new, including 14 in Alabama. Accepting Gore's argument that punitive damages should be calculated by multiplying the approximately 1,000 repaired cars by the $4,000 lost value per car, the jury awarded $4 million. The Alabama Supreme Court disapproved the jury's computing the punitive damages award by multiplying the compensatory damages by the number of sales in other jurisdictions and ordered a $2 million remittitur. The United States Supreme Court concluded that the Alabama high court properly removed BMW's out-of-state conduct from the calculation. There was no evidence that failure to disclose repairs constituted an unfair trade practice or was otherwise unlawful in other states, and no state has the power to punish BMW for conduct that was lawful where it occurred and did not affect the punishing state or its residents. 517 U.S. at 572-73.

The Supreme Court began its analysis by stating:

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. . . . Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment. [Citations omitted.]" 517 U.S. at 568.

With regard to whether BMW received fair notice of the conduct that would subject it to punishment and of the severity of the penalty that the state might impose, the Supreme Court's analysis examined the three guidepost—reprehensibility, ratio of punitive damages to harm, and comparison of punitive damages to civil sanctions.

The Supreme Court stated that the degree of reprehensibility of defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," 517 U.S. at 575, and concluded that BMW's conduct was not sufficiently reprehensible to warrant the $2 million punitive damages award. Central to the Supreme Court's analysis was that BMW's nondisclosure policy for repair of minor damage had not been shown to be inconsistent with state statutes that require disclosure of material damage and that actionable fraud requires a material omission. The Supreme Court also noted that defendant's conduct was an omission, which "may be less reprehensible than a deliberate false statement, particularly when there is a good-faith basis for believing that no duty to disclose exists." 517 U.S. at 580.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." 517 U.S. at 580. Although reiterating that no mathematical bright line exists between constitutionally acceptable and unacceptable, the Supreme Court called the 500-to-1 ratio between Gore's punitive and compensatory damages "breathtaking." 517 U.S. at 583. The Supreme Court particularly noted that harm to Gore was limited to actual harm with no threat of any additional potential harm from defendant's conduct. 517 U.S. at 581-82.

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." 517 U.S. at 583. In making this comparison, a reviewing court defers to legislative determinations of appropriate sanctions. Because the $2 million punitive damages award was "substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance" and because there was no showing that deterrence required the

drastic measure, the Supreme Court concluded that the award was unjustified. 517 U.S. at 584.

In *Campbell*, the question before the Supreme Court was whether, in the circumstances, "an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States." 538 U.S. at 412. Campbell attempted to pass six vehicles on a two-lane highway. Ospital, the driver of an oncoming car swerved to avoid a head-on collision with Campbell, lost control, and collided with another vehicle driven by Slusher. Ospital was killed; Slusher was permanently disabled. State Farm, Campbell's insurer, refused offers to settle for the $50,000 policy limits with Ospital's estate and with Slusher. In taking the case to trial, State Farm ignored the advice of its own investigator and told the Campbells their assets were safe and they did not need separate counsel. The jury found Campbell 100% at fault and returned a judgment for $185,849. Then State Farm refused to cover the excess liability, refused to post a supersedeas bond for an appeal, and suggested that the Campbells " 'put for sale signs on [their] property to get things moving.' " 538 U.S. at 413. Campbell, Ospital, and Slusher entered into an agreement. Ospital and Slusher agreed not to seek satisfaction of their claims against the Campbells. The Campbells agreed to be represented by the plaintiffs' attorneys and prosecute a bad-faith action against State Farm in which Ospital and Slusher would have decision-making authority and would receive 90% of any verdict against State Farm. When the Utah Supreme Court eventually affirmed the verdicts in the wrongful death and tort actions, State Farm paid the entire judgment.

The bad-faith action was bifurcated. In the first phase, State Farm's refusal to settle was determined by a jury to be unreasonable. In the second, a jury awarded $2.6 million in compensatory damages for fraud and intentional infliction of emotional distress and $145 million in punitive damages. The Campbells' proof was of a national corporate policy implemented to increase profitability by capping payouts on claims. They introduced evidence of fraudulent practices by State Farm over a 20-year period in all its na-

tionwide operations, most not pertaining to third-party automobile insurance claims. The trial court reduced the compensatory and punitive awards to $1 million and $25 million respectively. Ostensibly applying the *Gore* guideposts, the Utah Supreme Court reinstated the $145 million punitive damages award. The United States Supreme Court strongly disagreed with the state court's analysis: "Under the principles outline in *BMW of North America, Inc. v. Gore*, this case is neither close nor difficult. It was error to reinstate the jury's $145 million punitive damages award." 538 U.S. at 418.

As a foundation for considering the first *Gore* guidepost, the reprehensibility of State Farm's conduct, the Supreme Court stated: "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation omitted.]" 538 U.S. at 419. With regard to gauging defendant's reprehensibility the Supreme Court reiterated instructions to consider the following factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." 538 U.S. at 419.

As in *Gore*, the Supreme Court disapproved an award of punitive damages that bore no relation to the plaintiff's harm: "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." 538 U.S. at 423. The Supreme Court's review of the Utah courts' decisions did not convince the justices "that State Farm was only punished for its actions toward the Campbells," 538 U.S. at 423, and revealed that the

Campbells had shown no conduct by State Farm similar to that which harmed them, even though "the conduct that harmed them is the only conduct relevant to the reprehensibility analysis." 538 U.S. at 424. For State Farm's handling of the claims against the Campbells, the Supreme Court found no error in awarding punitive damages but stated that "a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives." 538 U.S. at 419-20.

The Supreme Court declined again to impose a bright-line ratio that cannot be exceeded, but cautioned that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. Thus, there was a presumption against the reasonableness and proportionality of the 145-to-1 ratio of the Campbells' damage awards. 538 U.S. at 426. And the justifications adopted by the Utah Supreme Court either were not supported in the record—harm to numerous Utah consumers—or not relevant to the award's reasonableness or proportionality to the harm—State Farm's failing to disclose a large punitive damages award in another state, the likelihood that State Farm will only be punished in one of 50,000 cases, and State Farm's great wealth. Concerning the latter, the Supreme Court stated: "The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." 538 U.S. at 427.

Comparison of the punitive damages award with civil sanctions also disfavored the award. The Supreme Court found that the most relevant civil sanction under Utah state law was a $10,000 fine for fraud, "an amount dwarfed by the $145 million punitive damages award." 538 U.S. at 428.

The Supreme Court concluded that the punitive damages award, which was neither reasonable nor proportionate to the wrong committed, "was an irrational and arbitrary deprivation of the property of the defendant" in violation of due process. 538 U.S. at 429. The Court suggested that a punitive damages award of approximately the same amount as the compensatory damages award would pass muster under the *Gore* test. 538 U.S. at 429.

*Application of Gore guideposts in the present case—reprehensibility.* MCMC contends that any evidence of reprehensible conduct on its part is weak. Woody's and Decor point out that the trial judge found a good deal of evidence of seriously reprehensible conduct. It included that defendants were driven by profit motive to abandon prudent operating procedures and ignore consequential dangers, defendants operated without regard for the safety of the community, defendants withheld information from public regulators, and after the gas had escaped defendants failed to cooperate with the public they had endangered.

Following the five indicia of reprehensibility, MCMC first states that the harm caused was economic rather than physical. As a matter of good fortune, the harm to Woody's and Decor was economic only, but the potential for physical harm to the staff and customers of the two businesses and other persons in downtown Hutchinson was considerable. The plaintiffs contend that the court should take into consideration that MCMC's conduct caused physical harm and death to other parties, namely the Hahns. Due process permits a defendant to be punished only for the conduct that harmed the plaintiffs in this action. Punishment based on the merits of other parties' claims "creates the possibility of multiple punitive damages awards for the same conduct." 538 U.S. at 423.

MCMC contends that its conduct did not reflect an indifference to or a reckless disregard of the safety of Hutchinson residents. MCMC underlines the distance between Yaggy and Hutchinson and the paucity of population where Yaggy is located. MCMC's argument almost proves too much. It is true that no one foresaw gas stored at Yaggy would migrate all the way to a population center, but the fact that it did demonstrates how significantly MCMC deviated from sound operating procedures to pump the gas so much further than was anticipated. Moreover, as pointed out by plaintiffs, MCMC's "stonewalling" after the explosion and fire does not reflect regard for the safety of Hutchinson residents.

Appellees state that the victims included ordinary people but do not direct the court's attention to any evidence of financial vulnerability of Woody's and Decor.

MCMC's position is that the factor, whether the conduct involved repeated actions or was an isolated incident, takes into account only foreseeably risky conduct. In the absence of evidence that it knew that exceeding the MAOP posed a threat, MCMC argues, its repeated violations of the maximum allowable operating pressure do not count in assessing the degree of reprehensibility of its conduct. As authority for its contention, MCMC cites *Campbell*, 538 U.S. at 419. The Supreme Court's discussion of the factors to be considered does not support MCMC's view. The MAOP in Pod 1 at Yaggy was exceeded every day during November 2000 and 45 days during the 3 months preceding the rupture of well S-1 in January 2001. MCMC's conduct was not an isolated incident.

MCMC denies that there is any evidence that it deceived or misled anyone with regard to its operations at Yaggy. But we note there is evidence that information material to the safe operation of the storage facility, including information required in annual reports, was concealed from KDHE.

In *Campbell*, the Supreme Court stated that "[a]pplying these factors in the instant case, we must acknowledge that State Farm's handling of the claims against the Campbells merits no praise." 538 U.S. at 419. The same thing certainly can be said with regard to MCMC's operation of the Yaggy gas storage facility. And, in particular, its conduct in overpressurizing Pod 1 and then continuing to inject gas for days after persistently falling pressure signalled a leak merits no praise. Unlike *Campbell*, this case was not used as a platform to expose and punish defendants' operations beyond Yaggy gas storage facility. Evidence was limited to conduct related to the rupture of well S-1 and the escape of natural gas from Pod 1.

*Gore* guideposts—ratio. The punitive damages award to Woody's and Decor was $5,250,000, and the compensatory damages award was $1,710,888.15. The ratio of punitive to compensatory damages is 3-to-1, well within the contemplation of the Supreme Court that in *Gore* and *Campbell* "referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple dam-

ages to deter and punish." 538 U.S. at 425 (citing 517 U.S. at 581 and n.33.

But MCMC contends that "net" compensatory damages of $130,596.99 ought to be used in calculating the ratio. "Net" compensatory damages, according to MCMC, are computed by applying setoff and percentage of fault. The amount of setoff that MCMC asserts is due to it is $436,644.33 on Woody's claim and $288,202.75 on Decor's claim for a total setoff of $724,847.08. The jury assigned MCMC 50% of the fault. 50% of the compensatory damages award is $855.444.08. $855,444.08 less $724,847.08 is $130,597. The ratio of $5,250,000 to $130,597 is 40-to-1.

The question is whether there is any rational or legal basis for reducing the amount of the compensatory damages award for the purpose of calculating the *Gore* ratio. The justification offered by MCMC for reducing compensatory damages by the percentage of fault is that a defendant's punishment should be only "for the extent to which its conduct contributed to Plaintiffs' losses." For reducing damages by setoff, MCMC cites no legal authority. The extent to which MCMC's *conduct* contributed to plaintiffs' losses is not altered by insurance coverage. There is no sound reason for subtracting setoff before calculating the ratio of punitive to compensatory damages. Moreover, in its reply brief, MCMC states the ratio is 3-to-1 or 6-to-1 and seems to have abandoned the argument that it should be computed with compensatory damages reduced by setoff.

For reducing damages by percentage of fault, MCMC relies on *Waddill v. Anchor Hocking, Inc.*, 190 Or. App. 172, 78 P.3d 570 (2003), a case in which the plaintiff's contributory fault was set at 25%. Waddill argued for calculating the ratio of punitive to compensatory damages on the basis of the actual damages she suffered, but the Oregon Court of Appeals concluded that the proportion of compensatory damages defendant caused was "the proper basis for determining the amount of punitive damages for which it should be legally responsible." 190 Or. App. at 183 n.6. Plaintiffs would distinguish *Waddill* from the present case on the ground that the 25% fault assigned to Waddill constituted a reduction in defendant's culpability by the amount of plaintiff's fault, but the 50-50

split for defendants' fault in the present case reflects only that wrongdoers wore both MCMC and ONEOK hats. Woody's and Decor's characterization of the assignment of fault rings true. The evidence did not provide a basis for a sound determination that each defendant's conduct was only half the cause of the harm, but there was evidence of extensively intermingled and overlapping corporate structures. Hence, the percentage of fault assigned to MCMC does not seem to reflect reduced culpability, as it did in *Waddill*. Even if the ratio in this case were calculated as punitive to 50% of compensatory damages, the ratio of 6-to-1 would be well within the "[s]ingle-digit multipliers [that] are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution," than awards with much greater ratios. 538 U.S. at 425.

MCMC urges the court to conclude that a 6-to-1 ratio in this case is too great because the compensatory damages award was substantial. MCMC refers to something it calls "the *Campbell* rule" to the effect that "where 'compensatory damages are substantial,' a 1-to-1 punitive-to-compensatory damage ratio is constitutionally mandated." MCMC also states: "Because 'compensatory damages are substantial,' *Campbell* dictates that a 1-to-1 punitive-to-compensatory damages ratio represents the 'outermost limit of the due process guarantee.' *Campbell*, 538 U.S. at 425." MCMC distorts what the Supreme Court actually said in *Campbell*, which is the following:

"Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citation omitted.] The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, *can* reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (Emphasis added.) 538 U.S. at 425.

Nor does *Patton v. TIC United Corp.*, 859 F. Supp. 509 (D. Kan. 1994), *aff'd* 77 F.3d 1235 (10th Cir. 1996), cited by MCMC, support the proposition that punitive damages cannot exceed substan-

tial compensatory damages. *Patton is* a products liability action in which the trial court rejected defendant's argument that imposition of punitive damages would violate its due process rights and awarded $1 million. Whether punitive damages were limited to the amount of compensatory damages was not at issue. The first question was whether defendant could be liable for punitive damages based on its breach of a post-sale duty to warn when defendant claimed that judicial creation of the duty had not given it timely notice of potential liability to plaintiff. That question involved unfair procedure rather than the substantive due process question whether the amount of the punitive damages award was excessive. The other question before the trial court was whether to award punitive damages pursuant to K.S.A. 60-3702. MCMC also cites *Patton* as referencing two other cases for ratios of approximately 1-to-1 and less. The context in which the two other cases were cited is a discussion of the K.S.A. 60-3702 factors, and the "referenced references" appear in a footnote that recounts and simply takes note of the plaintiff's argument for considering the reasonableness of a multiplier of actual damages. 859 F. Supp. at 513 n.6.

Other lessons from Supreme Court cases support the conclusion that a 3-to-1 or even 6-to-1 ratio in the circumstances of this case satisfied due process. The first concerns possible duplication in compensatory and punitive awards. In *Campbell,* for instance, the compensatory damages included a sizeable component for intentional infliction of emotional distress, which was duplicated in the punitive award. But in the present case there is a very clear demarcation between the compensatory damages for property losses and expenses and the punitive award. The other highly significant factor in the present case is the enormous potential harm resulting from defendants' conduct. 143 million cubic feet of natural gas escaped confinement and was pumped for miles atop a geological formation to erupt to the surface through existing wells in a populated area. The well beneath Woody's and Decor allowed gas to rise to the surface, explode, and then fuel the fire so that, according to Mike Patterson, within a short time of the explosion no person trapped in either building could have escaped. With good fortune, all customers and employees of the two businesses were able to

flee the structures. Four days after the explosion, enough natural gas was still rising at the Woody's and Decor site to prompt the decision to control it by igniting and flaring off the gas. In *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 459-60, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993), the Supreme Court quoted the following example from a state court opinion:

" 'For instance, a man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is to a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care. We would allow a jury to impose substantial punitive damages in order to discourage future bad acts.' [*Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656,] 661, 413 S.E.2d [897], 902 (citing C. Morris, Punitive Damages in Tort Cases, 44 Harv. L. Rev. 1173, 1181 (1931))."

In the present case, by sheer chance, no one was injured in the Woody's and Decor explosion and fire. But the potential harm was prodigious, and the harm likely to result from defendants' conduct is to be taken into account in calculating punitive damages. 509 U.S. at 460.

*Gore* guideposts—punitive damages award compared to available sanctions. MCMC reports that it was fined $180,000 by KDHE for the Yaggy gas escape and required to reimburse approximately $79,000 in administrative costs and expenses. In addition, it was "required to spend hundreds of thousands of dollars to remediate and prepare a geoengineering report regarding Yaggy." Woody's and Decor accept the figure of $260,000 as MCMC's administrative liability. No dollar figure is offered for the maximum *available* civil penalties. There is an unsigned and incomplete (missing page 2) consent order between KDHE and ONEOK in the record on appeal, with a signed and complete copy appended to appellees' brief at Tab B, noting that K.S.A. 65-170d provides for fines up to $10,000 per day for violations of duly promulgated rules or regulations. Regulations cited in the consent order govern operation and construction of existing hydrocarbon storage wells, monitoring such wells, and reporting spills. In addition to requiring ONEOK to pay $180,000 to Hutchinson for violations of regulations, the consent order requires ONEOK to continue monitoring vent wells, then close exploratory and vent wells pursuant to a KDHE-ap-

proved plan, drill additional monitoring and vent wells as directed by KDHE, submit to KDHE a comprehensive geoengineering plan prepared by a mutually agreed third party, and perform a soil cleanup of brine around the geyser wells according to a KDHE-approved plan. The remediation requirements, as MCMC suggests, imposed a substantial financial burden.

There are at least two problems with MCMC's position that "the comparable civil penalties guidepost *requires* reduction of the punitive damages to an amount no greater than the award for compensatory damages." (Emphasis added.) First, the comparison is between punitive damages and available civil penalties, not punitive and compensatory damages. Second, as with its faulty assertion that substantial compensatory damages *require* a 1-to-1 ratio of punitive to compensatory, MCMC would transform what the Supreme Court formulated as an instructive comparison into a mandatory equalization. There is no authority for the proposition that punitive damages cannot exceed available civil penalties. MCMC relies on *Lincoln v. Case*, 340 F.3d 283 (5th Cir. 2003), in which a punitive damages award was reduced to the amount of the available civil penalty for housing discrimination based on race. The federal court concluded that, in the circumstances of the case, where compensatory damages for a violation of civil rights were quite limited and the statutory maximum civil penalty for a first-time violation was $55,000, a punitive damages award coextensive with the civil penalty would be "reasonable and proportionate to the wrong committed." 340 F.3d at 294. *Lincoln* does not support MCMC's contention that a punitive damages award cannot exceed comparable civil sanctions.

The parties agree that MCMC was penalized $260,000, and, according to MCMC, it was required to expend additional hundreds of thousands of dollars for required remediation. This is not a case like *Campbell*, where the $10,000 civil sanction was dwarfed by the $145 million punitive damages award. See 538 U.S. at 428. Nor is it a case like *Gore*, where the $2 million punitive damages award was 100 times greater than the $2,000 maximum civil penalty legislatively authorized for a deceptive trade practice. See 517 U.S. at 584. Here, a very rough estimate of the sanctions imposed tops

half a million dollars, and the punitive damages award was $5,250,000.

Financial condition. MCMC urges the court to take its financial condition, which it describes as typified by loss rather than profit, into consideration in determining whether the punitive damages award is unconstitutionally excessive. In support, MCMC cites an American Law Institute study, which predates controlling Supreme Court cases. In *Gore*, the Supreme Court observed that a defendant's financial condition does not affect its substantive due process rights: "The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business." 517 U.S. at 585. In *Campbell*, the Supreme Court stated that State Farm's assets "had little to do with the actual harm sustained by the Campbells. The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. *Gore*, 517 U.S. at 585." 538 U.S. at 427. On this subject, the Court also quoted the following from Justice Breyer's concurring opinion in *Gore*: "'[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy . . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as "reprehensibility," to constrain significantly an award that purports to punish a defendant's conduct')." 538 U.S. at 427-28 (quoting 517 U.S. at 591). *Gore* and *Campbell* teach that consideration of wealth is a merely peripheral consideration compared to the three guideposts, which attend more closely to a defendant's conduct than to its status. It seems reasonable to extend the principle to what MCMC urges the court to view as the lack of wealth, which also would be merely peripheral to the guideposts. (As will be seen in the following paragraph, the measure of wealth or lack of it may be subject to varying constructions.)

MCMC also cites K.S.A. 60-3702 as support for its contention that the punitive damages award ought to be reduced on account of its financial condition. K.S.A. 60-3702(b)(3) identifies the profitability of a defendant's misconduct as a factor to be considered by the court in determining the amount of a punitive damages

award. This statutory factor is whether MCMC's misconduct that harmed plaintiffs generated financial gain for defendant; it is not a measure of defendant's wealth or lack of it. The statutory provision that does take MCMC's financial condition into account is K.S.A. 60-3702(e), which provides that an award of punitive damages cannot exceed the lesser of defendant's annual gross income or $5 million. The gross annual income figures, as distinguished from profit and loss figures, stated by MCMC in its brief range from $34 million to $5.5 million between 1996 and 2003. The record reference for the gross annual income figures is a punitive damages memorandum filed by MCMC; no source is given for the figures. The memo shows that in 2001, with the rupture of S-1 well occurring in January of that year, MCMC's gross annual income was $29,539,260. It fell in 2002 to $14,236,043 and in 2003 to $5,471,926. In the memo, defendant states: "The financial condition of MCMC has been impacted by the closure of Yaggy and its inability to fulfill storage contracts. MCMC has suffered significant financial loss."

Application of the *Gore* guideposts to the circumstances of this case does not lead to the conclusion that the punitive damages award is grossly excessive so as to violate MCMC's substantive due process rights.

The final issue raised by appellants is whether the punitive damages award violates the statutory cap of K.S.A. 60-3702(e).

Interpretation of a statute is a question of law, and the court's review is unlimited. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004).

K.S.A. 60-3702(a) provides:

"In any civil action in which exemplary or punitive damages are recoverable, the trier of fact shall determine, concurrent with all other issues presented, whether such damages shall be allowed. If such damages are allowed, a separate proceeding shall be conducted by the court to determine the amount of such damages to be awarded."

In the trial of the consolidated civil actions brought respectively by Woody's and Decor, the jury found that punitive damages should be allowed against MCMC.

K.S.A. 60-3702(e) provides:

"Except as provided by subsection (f), no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of:

(1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded, unless the court determines such amount is clearly inadequate to penalize the defendant, then the court may award up to 50% of the net worth of the defendant, as determined by the court; or

(2) $5 million."

After considering the evidence presented at trial, at a hearing on the issue, and the arguments of counsel, the trial judge made the following announcement of his ruling on punitive damages against MCMC:

"The parameters of this award fall between zero and the statutory cap of ten million dollars, since this case does constitute two separate suits. While the appropriateness and necessity of a punitive award is without doubt, in my mind such an award must be tempered with reason. The purpose of the award is to punish misconduct and to assure proper deterrence against future similar acts. Towards this, neither extreme is necessary to accomplish the purpose of a punitive award. After consideration, I am going to make a punitive award, a punitive judgment in the amount of $5,250,000."

MCMC seeks to have the punitive damages award reduced to $5 million on the ground that the $5 million statutory cap is the total amount of punitive damages that may be assessed against one defendant for a single "set" of wrongful conduct. Woody's and Decor argue that separate punitive damages caps were applicable to each of the two civil actions that make up the consolidated cases.

In support of its position that the legislature intended a punitive damages award to punish a defendant for the whole of its wrongful conduct rather than for the part of its wrongful conduct that affected a particular plaintiff, MCMC characterizes the factors identified in K.S.A. 60-3702 as pertaining to the entirety of defendant's wrongful conduct. The factors MCMC alludes to are those enumerated in K.S.A. 60-3702(b):

"At a proceeding to determine the amount of exemplary or punitive damages to be awarded under this section, the court may consider:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected."

The statutory factors to be considered by a court in computing the amount of a punitive damages award relate to the defendant's misconduct rather than the harm to a particular plaintiff because punitive damages, unlike compensatory damages that are based on harm suffered by a plaintiff, are not intended to remunerate the victim. Instead, "[i]n Kansas, punitive damages are awarded to punish the wrongdoer for malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 366, 837 P.2d 330 (1992).

"Punitive damages are not given upon any theory that the plaintiff has any just right to recover them but are given only upon the theory that the defendant deserves punishment for his or her wrongful acts and that it is proper for the public to impose them upon the defendant." *Smith v. Printup*, 262 Kan. 587, Syl. ¶ 6, 938 P.2d 1261 (1997).

Moreover, as Woody's and Decor point out, the plain language of K.S.A. 60-3702(b)(7) contemplates that the misconduct at issue may give rise to imposition on defendant of other damages and punishment, including exemplary and punitive damage awards to persons in situations similar to those of the claimant. Kansas case law, also, recognizes that multiple punitive damage awards may arise out of the same misconduct. *McDermott v. Kansas Public Serv. Co.*, 238 Kan. 462, 467, 712 P.2d 1199 (1986). And in *Scheufler v. General Host Corp.*, 126 F.3d 1261, 1272 (10th Cir. 1997), the federal Court of Appeals noted that *Gore*, 517 U.S. 559, found no constitutional infirmity in multiple punitive damage awards arising out of the same conduct.

If the same misconduct can give rise to multiple punitive damages awards in multiple cases, no reason presents itself why the same misconduct cannot give rise to multiple punitive damages awards in consolidated cases. The separate actions brought by Woody's and Decor no doubt were consolidated to promote judicial efficiency and economy, and there is no reason to discourage that practice by deeming the punitive damages awarded to plaintiffs in separately filed, consolidated cases to be a single award that is subject to the statutory cap. For Woody's and Decor, two plaintiffs who filed two separate actions that were consolidated for trial, the statutory cap applies separately in each case. Thus, the $5,250,000 award is within the $10 million limit.

Citing *Campbell*, MCMC contends that the only constitutional construction of K.S.A. 60-3702 limits a defendant's punitive damage exposure to $5 million regardless of the number of victims. At the page of the *Campbell* opinion cited by MCMC, the Supreme Court considered whether a punitive damages award can constitutionally include a component for "other parties' hypothetical claims" against defendant. 538 U.S. at 423. In stating why others' hypothetical claims could not be part of the calculation, the Court quoted the following from Justice Breyer's concurring opinion in *Gore*, 517 U.S. at 593: " 'Larger damages might also "double count" by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover.' " 538 U.S. at 423. "Subsequent plaintiffs" plainly refers to the possibility that there may be other actions prosecuted by other parties against defendant and that punitive damages may be awarded in those other actions.

## CROSS-APPEAL

Woody's and Decor contend the trial court erred in denying their request for an award of attorney fees and expenses.

At the conclusion of a hearing on the plaintiffs' request for attorney fees and expenses, among other things, the trial judge took the matter under advisement and stated his intention to issue a written order at a later date. By a letter ruling that was incorporated

into the journal entry of judgment, the trial judge stated without reasons that he had decided to deny the request for attorney fees.

Woody's and Decor contend they are entitled to attorney fees and expenses under the express provisions of K.S.A. 55-1210(c)(3) and K.S.A. 66-176. Whether the trial court had authority to impose attorney fees under a particular statute is a question of law over which the court has unlimited review. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

K.S.A. 55-1210(c)(3). Chapter 55 of the Kansas Statutes Annotated governs oil and gas, and Article 12 of that chapter applies to the underground storage of natural gas. K.S.A. 55-1210 provides:

"(a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

"(b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. Nothing in this subsection shall be deemed to affect the right of the owner of the surface of such lands or of any mineral interest therein to drill or bore through the underground storage fields, sands, reservoirs and facilities in such a manner as will protect such fields, sand, reservoirs and facilities against pollution and the escape of the natural gas being stored.

"(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

(2) The injector, such injector's heirs, successors and assigns, shall have the right to conduct such tests on any existing wells on adjoining property, at such injector's sole risk and expense including, but not limited to, the value of any lost production of other than the injector's gas, as may be reasonable to determine ownership of such gas.

(3) The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the

surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

"(d) The injector, such injector's heirs, successors and assigns shall have the right to compel compliance with this section by injunction or other appropriate relief by application to a court of competent jurisdiction."

Subsection (a) of 55-1210 establishes that natural gas injected into underground storage units is at all times the property of the injector. Subsection (b) states the corollary of (a), that the owner of the surface or any mineral interests has no ownership right in the injected gas, but (b) preserves the right of the owner of the surface or any mineral interests to drill through storage units in a manner that will protect against pollution and escape of the stored gas. Subsection (c) applies when stored gas has migrated to property not controlled by the gas injector. Subsection (c)(1) provides that migration does not necessarily cause the injector to lose title to stored gas, and subsection (c)(2) authorizes the injector, at the injector's risk and expense, to conduct tests on adjoining property to determine ownership of migrated gas. Subsection (c)(3) provides compensation to the owners of the surface and stratum and entitles them to attorney fees if litigation is necessary to enforce rights or obtain compensation and the injector does not prevail. The compensation to which surface and stratum owners are entitled is "such compensation . . . as is provided by law." K.S.A. 55-1210(c)(3).

Woody's and Decor contend that the circumstances of the present case parallel those outlined in 55-1210(c)(3),—defendants' gas migrated from their storage facility, the gas exploded and fueled fires that damaged plaintiffs' surface interests, plaintiffs had to resort to litigation to enforce their rights to recover for the property damage, and the defendants did not prevail—thus entitling Woody's and Decor to recovery of attorney fees. They cite *Beck v. Northern Natural Gas Co.*, 170 F.3d 1018 (10th Cir. 1999), as requiring a ruling in their favor on attorney fees.

Beck was one of a number of landowners who sued Northern Natural Gas Company (Northern) for trespass and unjust enrichment when its stored gas vertically migrated from one subsurface

formation, Viola, to another, Simpson, underlying landowners' property. The case was removed from a Kansas district court and tried before a jury in federal district court. The jury found in favor of the landowners on both claims and awarded $100 per acre as fair rental value. Pursuant to K.S.A. 55-1210(c)(3), the district court assessed attorney fees, expenses, and costs in the amount of $139,554.10 against Northern.

On appeal, Northern argued that in allowing attorney fees, expenses, and costs the district court misinterpreted the statute. Northern advocated a reading of subsection (c)(3) that would make attorney fees, expenses, and costs available only when the ownership of gas is at issue. The Court of Appeals rejected the argument:

"Such an interpretation ignores the plain language of the statute, as does Northern's characterization of the 'rights under the subsection (c)' as only those described in subsections (c)(1) and (c)(2), that is, the ownership rights of the injector over the migrated gas and the right to conduct reasonable tests to determine ownership. The district court found that the 'rights under this subsection (c)' also referred to the right of the property owner in subsection (c)(3) to compensation for use of or damage to the surface or substratum, as is provided by law. Because the landowners recovered compensation for Northern's use of the Simpson formation and litigation was necessary to enforce this right, they were entitled to the fees and expenses described in subsection (c)(3). We do not find the statute to be ambiguous, and agree with the district court's analysis." 170 F.3d at 1023.

MCMC and ONEOK make an argument very similar to one rejected in *Beck*. They argue that the statute does not govern this case because the interests it protects are those of the gas injector. They point to the title of K.S.A. 55-1210 and cite *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 846, 610 P.2d 1107 (1980), for the proposition that the title of a statute "cannot be ignored as an aid in determining legislative intent." Where, as here, the statute expressly addresses matters and interests other than the property interests of the gas injector, it is obvious that the scope of the title is less comprehensive than that of the statute. However, in *State v. Martens*, 274 Kan. 459, Syl. ¶ 3, 54 P.3d 960 (2002), we held that the title is not dispositive because it is "prepared by the Revisor of Statutes and forms no part of the statute itself." Moreover, the title is unnecessary to a determination of legislative intent when

the language of the statute is plain. In addition, MCMC and ONEOK sap their own argument by also contending that *Beck* should be distinguished from the present case because the statute makes attorney fees available to plaintiffs who seek compensation for lease value of a substratum, as in *Beck*. The statute also expressly makes attorney fees available to plaintiffs seeking compensation for damage to a substratum or for use of or damage to the surface. Thus, neither the factual ground on which MCMC and ONEOK would distinguish *Beck* from the present case nor their assertion that the statute protects only gas owners' rights is sound.

MCMC and ONEOK direct the court's attention to the statutory phrase: "if litigation is necessary *to enforce any rights under this subsection (c)*" (emphasis added) and contend that any rights enforced by Woody's and Decor in this action are common-law rights rather than rights under K.S.A. 55-1210(c). MCMC and ONEOK would have the court conclude, because plaintiffs recovered for negligence and negligence is not a theory of recovery created by subsection (c) of the statute, that attorney fees are not available to them under the statute. To illustrate, defendants state in their brief that "Plaintiffs' damages have nothing to do with the subsurface rights to occupy Plaintiffs' property or surface damage resulting from efforts to identify title to gas." Defendants' reading of the statute is too narrow. Subsection (c)(1), for example, is one of the subsections that defendants refer to in arguing that the statute protects only the gas owners' rights. Subsection (c)(1), however, does not create title in the natural gas. Instead, it provides some protection to the titleholder when gas migrates. Likewise, subsection (c)(3) does not create a cause of action but rather declares that damages will be available to substratum or surface owners as provided by law and provides for the recovery of attorney fees, expenses, and costs. The negligence action prosecuted by Woody's and Decor in the present action, although not a statutorily created cause of action, is "provided by law" for compensation for damage to the surface, as expressly secured by subsection (c)(3).

In *Beck*, the federal Court of Appeals awarded attorney fees on a common-law cause of action and explained it was the statute's

not creating an independent statutory cause of action for plaintiff that saved the statute from an unreasonable construction:

"Northern argues that the district court's construction of the statute leads to an absurd result, where the injector always pays for attorney fees and expenses, at least where litigation occurs. Thus, when there is litigation over the ownership of gas and it is determined that the gas belongs to the property owner, the gas injector pays for attorney fees and expenses. When the litigation results in a finding that the gas belongs to the injector, then the property owner can assert a claim of trespass on the basis of that finding and be entitled to attorney fees and expenses. However, in painting this scenario, Northern ignores the district court's conclusion that § 55-1210(c)(3) does not create an independent statutory cause of action for.trespass. Thus, the court required the landowners to prove each of the elements of common law trespass, which go beyond simply showing that an injector's gas has migrated onto a plaintiff's property. Specifically, a plaintiff is further required to show intent or negligence on the part of the injector. It is true, as Northern asserts, that a statute should be given 'a reasonable construction so as to avoid unreasonable or absurd results.' *Tompkins v. Bise*, 259 Kan. 39, 910 P.2d 185, 188 (Kan. 1996). However, the fact that § 55-1210(c)(3) does not provide an independent cause of action for trespass avoids the absurdity that Northern envisions. While our construction of the statute may not produce the kind of results that Northern considers optimal, we 'must give effect to the intent of the legislature as expressed rather than determine what the law should or should not be.' [Citation omitted.]" 170 F.3d at 1023-24.

Defendants also argue that plaintiffs' claims do not fall within 55-1210 because, as defendants assert, plaintiffs did not "raise issues of damage to the 'surface or substratum' of their property." Plaintiffs sought compensation for destruction of the structures and the contents of the structures on the surface of their property. The only interpretation of the statute that would not entitle these plaintiff surface owners to "compensation for . . . damage to the surface" would be the entirely too narrow one that would limit compensation to damage to the top layer of soil. The plaintiffs are entitled to attorney fees under the provisions of K.S.A. 55-1210(c)(3).

K.S.A. 66-176. Woody's and Decor also contend that they are entitled to an award of attorney fees under K.S.A. 66-176, which provides:

"Any public utility or common carrier which violates any of the provisions of law for the regulation of public utilities or common carriers shall forfeit, for every

offense, to the person, company or corporation aggrieved thereby, the actual damages sustained by the party aggrieved, together with the costs of suit and reasonable attorney fees, to be fixed by the court. If an appeal is taken from the judgment or any part thereof, it shall be the duty of the appellate court to include in the judgment additional reasonable attorney fees for services in the appellate court or courts."

Woody's and Decor contend that defendants are public utilities within the meaning of K.S.A. 66-104. The definition of public utility in 66-104 includes "every corporation [and] company . . . that now or hereafter may own, control, operate or manage, except for private use, any equipment [or] plant . . . for . . . the conveyance of oil and gas through pipelines in or through any part of the state."

MCMC and ONEOK do not deny that they are public utilities within the meaning of 66-104. Relying on *Grinsted Products, Inc. v. Kansas City Power & Light Co.*, 21 Kan. App. 2d 435, 901 P.2d 20 (1995), defendants argue that 66-176 does not apply because the Kansas Corporation Commission (KCC) must determine a public utility to be in violation of regulatory laws before a right of action exists under the statute. Defendants' argument assumes that there was no prior KCC determination in this case, and plaintiffs do not question the assumption.

Grinsted Products, Inc. (Grinsted) petitioned the district court to construe a Kansas City Power & Light's tariff, which discounted electricity rates to encourage business development, to apply to Grinsted. Grinsted sought refund of excess charges and, pursuant to 66-176, treble damages, attorney fees, and costs. Since then, 66-176 has been amended to remove the treble damages provision. L. 1995, ch. 36, sec. 1. Grinsted argued that the statute established a cause of action for damages separate from administrative relief through the KCC, but the district court dismissed the petition on the ground that the KCC must interpret and construe rate tariffs before petitioner may resort to the courts. The Court of Appeals affirmed. 21 Kan. App. 2d at 449.

Woody's and Decor would distinguish *Grinsted* as applying only to matters, such as excess charges for electricity, susceptible to a KCC administrative remedy. They contend that the KCC has nei-

ther expertise in nor remedies for improper underground storage of natural gas, that the Kansas Department of Health and Environment (KDHE) regulates gas storage wells, and that an administrative determination is unneeded in this case because KDHE has no jurisdiction to award damages or other compensation to plaintiffs, but, if an administrative proceeding must precede court review, KDHE already has conducted it. Woody's and Decor append to their brief a consent order imposing certain requirements on ONEOK by KDHE "in the matter of the natural gas explosion at Hutchinson, Kansas, during January, 2001." As noted elsewhere in this opinion, the copy of the consent order that is included in the record on appeal is not signed by all parties and is missing page 2. KDHE determined that ONEOK violated K.A.R. 28-45-6(b)(3), operation and construction of existing hydrocarbon storage wells, K.A.R. 28-45-7(c) and (j), monitoring requirements for stored hydrocarbon, and K.A.R. 28-48-2, spill reporting.

MCMC and ONEOK acknowledge that KDHE issued an administrative ruling in this matter but maintain that a KDHE ruling is irrelevant. They direct the court's attention to K.S.A. 66-176's being located in Article 1 of Chapter 66 that sets out the powers of the State Corporation Commission with respect to public utilities.

MCMC and ONEOK also cite *United Cities Gas Co. v. Brock Exploration Co.*, 984 F. Supp. 1379, 1383 (D. Kan. 1997), an action pursuant to K.S.A. 66-176 seeking damages from defendants' unlawful sales of natural gas within plaintiff's certified territory. MCMC and ONEOK cite the federal case as well as *Grinsted* for the administrative review requirement for suits predicated on 66-176. The present case, however, was not predicated on 66-176. In their amended petitions, Woody's and Decor pled causes of action for ultrahazardous activity, wanton conduct, negligence, and nuisance. In a separate claim for attorney fees, Woody's and Decor requested fees and costs pursuant to K.S.A. 66-176. Negligence was the only cause of action submitted to the jury.

Unlike K.S.A. 55-1210(c)(3), which provides compensation for damage as is provided generally by law, K.S.A. 66-176 provides that "[a]ny public utility . . . which violates any of the provisions

of law for the regulation of public utilities . . . shall forfeit . . . to the person . . . aggrieved *thereby,* the actual damages sustained by the party aggrieved, together with the costs of suit and reasonable attorney fees." (Emphasis added.) This case's being predicated on negligence rather than on violations of the provisions of law for the regulation of public utilities raises the question whether attorney fees are available under the statute for a common-law cause of action. In Kansas courts, parties cannot recover attorney fees in the absence of clear and specific statutory authority. *State, ex rel. v. Sage Stores Co.,* 158 Kan. 146, Syl., 145 P.2d 830 (1944). MCMC and ONEOK, however, have not challenged plaintiffs' 66-176 request for attorney fees on this ground.

The judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings to determine the amount of the setoff and the reasonable amount of attorney fees which plaintiffs are entitled to under K.S.A. 55-1210(c)(3).

LOCKETT, J., Retired, assigned.